WILLIAM G. CEAS AND COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Robert Pellegrino *et al.*, Appellees).

First District (Industrial Commission Division)   No. 1—92—0406WC

Opinion filed April 22, 1994.

STOUDER, J., joined by McCULLOUGH, P.J., dissenting.

Garofalo, Hanson, Schreiber & Vandlik, Chartered, of Chicago (Gregory P. Sujack, of counsel), for appellant.

Serkland & Muehlhausen, of Chicago, for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

On April 6, 1988, decedent, Carol Pellegrino, fell down a flight of stairs while working in a building in which the appellant, William G. Ceas and Company (the employer), was a tenant. As a result of the fall, she suffered a subdural hematoma and died on April 12, 1988. Her surviving spouse, Robert Pellegrino, and youngest son, Douglas Pellegrino (the claimants), sought death benefits pursuant to section 7(a) of the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.7(a)). The arbitrator awarded benefits to claimants in the amount of $236 per week to Robert Pellegrino and for the benefit of Douglas Pellegrino, son of decedent, for as long as he remained a full-time student and had not attained the age of 25. Burial expenses were awarded in the statutory amount of $1,750; medical expenses of $20,111 were also awarded. Both parties took a review of the arbitrator's decision to the Industrial Commission (Commission). The Commission, in an order dated June 14, 1991, affirmed the decision of the arbitrator. The circuit court confirmed the Commission's decision, and the employer now appeals to this court. On March 19, 1993, an opinion was filed by this court reversing the decision of the circuit court. Subsequently, claimants filed a petition for rehearing. The petition for rehearing was granted, and the opinion was withdrawn. After reviewing the entire matter, a majority of this court has reached the conclusion that the Commission's decision should be affirmed.

At this point, we note that the dissent gives a lengthy recounting of the case's procedural history. Admittedly, it is one filled with twists and turns. It appears that the dissent views this as reflective of an arbitrary and capricious approach to the case before us. Our perspective is that this has been an exceedingly difficult case, in which the majority has conscientiously endeavored to achieve a just result.

The following evidence was adduced at the arbitration hearing. We take exception to the dissent's implication that the following presentation of the facts gives a distorted presentation of the evidence.

Decedent was employed as a secretary by Ceas Mortgage Company. This company was on the second floor of an office building, along with Ceas Development and William G. Ceas and Company. A single oak staircase led up to the second floor. The building had no elevator. The stairway was the only way to get to and from the second floor and was used by employees of Ceas Mortgage Company, Ceas Development, and William G. Ceas and Company.

Part of decedent's duties included putting Federal Express envelopes into the Federal Express box at the end of the day. On April 6, 1988, another secretary, Nancy Horcher, noticed that decedent was in a hurry at the end of the day. Horcher testified that decedent had been running back and forth to get something finished before she left. Horcher heard a noise soon after decedent left the office. Horcher then looked out an interior window and saw that decedent had fallen at the bottom of the stairs. Horcher went to get help from the company comptroller, Kreil Greiter. On cross-examination, she noted that decedent sometimes drank alcoholic beverages during the work day. Horcher sometimes detected alcohol on decedent's breath when passing her at work. She did notice that decedent had been drinking on April 6, 1988.

Virginia Griffith, an employee of another tenant of the building, Fiordalis Associates, testified that at 5 p.m. on April 6, 1988, she had locked up her office to go to the washroom. Upon exiting the washroom, Griffith noticed a woman sprawled out on the floor at the bottom of the stairway. It is undisputed that this woman was decedent. Decedent was bald-headed; a wig lay off to her side. Griffith asked if she could help decedent, who appeared to be nervous and in a great hurry. Decedent said she had to get to the Federal Express box and then get home. About this time, a man from upstairs (Kreil Greiter) came down to offer assistance. Decedent did not say how she had fallen.

Bystanders helped her up, and she rested a few moments. Griffith noticed a gash with dried blood around it on the back of the decedent's head. She refused any medical assistance, namely, calling an ambulance. Decedent put the wig back on her head and left in the direction of the Federal Express box and, subsequently, drove out of the building's parking lot.

On cross-examination, Griffith stated that packages had to be in the Federal Express box at either 5 or 5:30 p.m. for the next day's delivery. Griffith thought she smelled the odor of alcohol on

decedent's breath; however, she did not think that decedent was under the influence of alcohol.

Greiter testified that he was the employer's comptroller. On the subject date at about 5 p.m., he opened the office door and saw decedent lying at the bottom of the steps, where Griffith was attending to her. Greiter went down the stairs to see if he could help. Decedent seemed disoriented. He said that he would call an ambulance, but she refused any medical assistance. Greiter helped get her on her feet. He noticed several Federal Express envelopes in her purse. Greiter also observed a lump on the back of her head. Greiter stated that he was aware of instances in which decedent had been drinking at work. Greiter did not smell alcohol on decedent's breath on the subject date.

On cross-examination, Greiter stated that he noticed nothing unusual about the stairs on the subject date. He reiterated that decedent was in a hurry; he did not see her go to the Federal Express box. At about 4:30 p.m. on the day in question, Greiter recalled seeing decedent moving quickly from the typewriter to the printer.

Claimant Robert Pellegrino testified that he had been married to decedent since April 14, 1956. After work on the date in question, claimant noticed that decedent was very upset. He noticed that she had bruises on her body and a bump on the back of her head. Decedent told the claimant that she had fallen at work. She told him that she was very upset about the fall and about her boss' habit of giving her things to do at quitting time. Claimant stated that decedent arrived home at the usual time, about 5:50 p.m.

On April 8, decedent began to complain that she felt like she was coming down with the flu. The following day, she was getting progressively worse and decided to lie down on the couch. When claimant could not awaken her, he summoned paramedics. Decedent was taken to Humana Hospital, where she died on April 12, 1988. The cause of death was listed as fontotemporal epidural hematoma. Experts for both claimant and the employer agreed that the fall was the cause of decedent's death.

Previously, decedent had suffered from breast cancer and had undergone a mastectomy of the left breast. At the time of her death, she was found to have advanced cancer of the breast with metastases to the brain and rib. Decedent had received chemotherapy and radiation treatment for her cancer. Claimant testified that decedent had completed her radiation therapy approximately one month before the date of the accident. Decedent had been taking the drug Coumadin as an anticoagulant and was also taking Nolvadex, an anti-estrogen breast cancer treatment.

Claimant testified that decedent drank alcohol socially, but was unaware of any instances in which she drank at work. Claimant did not notice alcohol on decedent's breath on April 6, 1988.

Kim Ash, a manager in the employer's executive office, testified that she noticed several incidents when decedent would be drinking around lunch time. Ash noticed the smell of alcohol on decedent several times a week. She did not notice such a smell of alcohol on decedent's breath on the subject day. Ash also testified that the last pick-up time on the Federal Express box outside the building had always been 6 p.m. None of the witnesses testified that they noticed the smell of alcohol on April 6, 1988, and Virginia Griffith stated that she did not believe decedent was under the influence of alcohol.

Dr. William Barnhart, testifying for the employer, opined that decedent's fall could have been a sequence of events which were the result of decedent being on Nolvadex, having been weakened from chemotherapy, and having metastatic cancer into the brain. Barnhart admitted that he could find nothing in the medical record to indicate that decedent was, in fact, weakened by cancer. He also stated that he used the word "potential" because he could not tell from the records whether decedent was suffering any side effects from the medicine.

Dr. Nathaniel Greenberg testified for claimant. In Dr. Greenberg's opinion, the fall was not due to either medication or brain metastases. He did state, though, that it was possible that a person could suffer dizziness from chemotherapy and that it was possible that the brain metastases could cause dizziness.

■ On appeal, the employer argues that the Commission erred in finding that this was an unexplained fall. In support, the employer argues that the Commission erroneously rejected the idiopathic nature of decedent's fall. Claimant argues that the fall was unexplained, rather than idiopathic. Idiopathic falls result from internal, personal origins, while unexplained falls result from neutral origins. (*Oldham v. Industrial Comm'n* (1985), 139 Ill. App. 3d 594, 487 N.E.2d 693.) Illinois denies compensation for idiopathic falls (*Elliot v. Industrial Comm'n* (1987), 153 Ill. App. 3d 238, 505 N.E.2d 1062), but awards compensation for unexplained falls. *Chicago Tribune Co. v. Industrial Comm'n* (1985), 136 Ill. App. 3d 260, 483 N.E.2d 327.

The employer suggests that this issue should be reviewed as erroneous as a matter of law. The employer cites *Caterpillar Tractor Co. v. Industrial Comm'n* (1989), 129 Ill. 2d 52, 541 N.E.2d 665, for the proposition that when undisputed facts are susceptible to a single reasonable inference the issue presented to the court on review becomes a question of law. Claimant agrees with this proposition, but

points out that the facts in this case are susceptible to more than one inference. If more than one inference may be drawn from the undisputed facts on any issue, the determination of such issues is a question of fact, and the conclusion of the Commission will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*Caterpillar*, 129 Ill. 2d 52, 541 N.E.2d 665.) We agree with claimant. From the undisputed facts of this case, one could conclude either that decedent suffered an idiopathic fall or an unexplained fall. Therefore, this issue should be reviewed under the manifest weight of the evidence standard.

■ The finding of the Commission that this was an unexplained fall was not contrary to the manifest weight of the evidence. The employer's expert witness, Dr. Barnhart, testified that in his opinion decedent's cancer-related condition caused her fall. Dr. Barnhart admitted that he could not find evidence in the medical record that decedent was in a weakened condition or that she was suffering any side effects from medication. Also, other employees of the William Ceas Company testified that decedent was functioning normally, had not had any dizzy spells, nor had she had any other falls at work. It was for the Commission to determine whether or not the fall was unexplained, and the Commission's decision was clearly not against the manifest weight of the evidence.

■ The employer also argues that the finding of the Commission that the fall occurred on the employer's premises was against the manifest weight of the evidence. *Illinois Bell Telephone Co. v. Industrial Comm'n* (1989), 131 Ill. 2d 478, 546 N.E.2d 603, was cited for the proposition that injuries sustained by an employee leaving from work in the common areas of a building are not compensable. Claimant argues that *Illinois Bell* is not applicable because the employer in that case was a tenant occupying an office on the second floor of a shopping mall complex. The employer in that case had no interest in the common areas of the building. There were many different mall entrances, and employees were not expected to use any particular route to get to the employer's premises. In the instant case, William Ceas Company, Ceas Development, and Ceas Mortgage Company occupied the entire second floor of the building. The stairway in question was the only way for employees to get to work. The only people who used the stairway were Ceas employees and Ceas customers. Therefore, claimant argues that this is an entirely different situation than in *Illinois Bell*. Claimant asserts that we should follow the decision in *Master Leakfinding Co. v. Industrial Comm'n* (1977), 67 Ill. 2d 517, 367 N.E.2d 1308. In that case, claimant suffered a fall on the back stairs of a building the employer shared

with an architectural firm with which it was engaged in a joint venture. The Commission in that case believed the stairs to be a part of the employer's premises. The Commission's award was reinstated by the supreme court.

We find that the circuit court and Commission were correct in deciding that the stairway in this case was on the employer's premises. The circuit court noted the intertwined nature of the Ceas companies and that the stairway was the only means to get to and from the second floor. This would make the instant case more similar to *Master Leakfinding* than to *Illinois Bell*.

■ Further, the employer argues that the finding of the Commission that the accident arose out of decedent's employment is erroneous as a matter of law and contrary to the manifest weight of the evidence. For an employee's injuries to be compensable, those injuries must arise out of and in the course of his or her employment, and both elements must be present at the time of the accident to justify compensation. (*Hatfill v. Industrial Comm'n* (1990), 202 Ill. App. 3d 547, 560 N.E.2d 369.) "Arising out of" refers to the origin or cause of the accident and presupposes a causal connection between employment and the accidental injury; "in the course of" refers to the time, place and circumstances under which the accident occurred. *Illinois Bell*, 131 Ill. 2d 478, 546 N.E.2d 603.

It is the Commission's province to determine the credibility of the witnesses and to determine causal connection between a claimant's condition of ill being and her employment. (*BMS Catastrophe v. Industrial Comm'n* (1993), 245 Ill. App. 3d 359, 365.) The question of whether an injury is causally connected to a person's employment is to be determined by the Commission, and its decision will not be set aside unless it is against the manifest weight of the evidence. (*Williams v. Industrial Comm'n* (1993), 244 Ill. App. 3d 204.) A reviewing court will not reject reasonable inferences made by the Commission merely because the court might have drawn contrary inferences on the same facts. *Archer Daniels Midland Co. v. Industrial Comm'n* (1990), 138 Ill. 2d 107.

Claimant testified that, after the subject fall, decedent had told him about her anger with the boss' habit of giving her things to do right before quitting time. Nancy Horcher stated that, right before the fall, decedent had been running back and forth to finish something before she left. Kreil Greiter also saw decedent hurriedly moving from her "typewriter" to the printer immediately prior to quitting time. Subsequently, Horcher heard the noise of decedent falling down the stairs. Virginia Griffith testified that she came upon decedent sprawled on the floor. Griffith sought to help decedent, who

stated that she had to get to the Federal Express box. Decedent appeared nervous and in a great hurry. Greiter, who came from upstairs, assisted Griffith in getting decedent to her feet. Greiter and Griffith offered to assist decedent in obtaining medical help. Decedent declined, stating that she had to get to the Federal Express box to mail envelopes. Greiter observed several Federal Express envelopes in decedent's hands. There was no indication that the Federal Express envelopes were anything but the employer's business, and after she got up from the fall, she took a right turn to the Federal Express box. The evidence as to when envelopes had to be delivered to the Federal Express box to ensure next day delivery was conflicting. Also, the record does not indicate that decedent was going anywhere but home, after first dropping off the envelopes in the Federal Express box.

From these facts, the Commission could have inferred the following. At the end of a workday, decedent had been told by her boss to prepare and mail a number of Federal Express envelopes. It was typical of the boss to make this type of last-minute demand of decedent. Decedent rushed to prepare the employer's envelopes. She then hurriedly left the office. Her immediate destination was the Federal Express box located on the premises where she would mail the envelopes. In the process of quickly going down the stairs, decedent lost her footing, fell down the stairs and incurred the fatal injury. But for the employer's habit of requiring last-minute preparation and mailing of Federal Express envelopes and the resulting stress that it placed on decedent, there would have been no fatal fall.

Given these permissible inferences, claimant proved that the risk of this type of injury to decedent was increased as a consequence of her work. *Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38, 509 N.E.2d 1005.

The dissent asserts that the majority opinion classifies claimant's fall as employment related and omits testimony that undermines that finding. The evidence, however, clearly supports the Commission's reasonable inference that claimant's fall occurred while she was in the process of going to the Federal Express box to mail envelopes transmitting business of the employer. As pointed out in this opinion, the Commission found that the claimant was in the course of her employment at the time of the fall. This was a reasonable inference the Commission could make from the facts. The dissent seeks to avoid this finding by stating that as a matter of law claimant's fall did not arise out of her employment. Nevertheless, claimant was on the way to deposit mail in the Federal Express box, and she was in a hurry because of the fact that her employer was

loading her with duties close to the time her employment for the day had ended, namely, at 5 p.m. The foregoing facts support the finding of the Commission, and such a finding was not contrary to the manifest weight of the evidence.

Accordingly, the Commission's decision that decedent's accident arose out of and in the course of her employment is not against the manifest weight of the evidence.

The judgment of the circuit court is affirmed.

Affirmed.

RAKOWSKI and RARICK, JJ., concur.

JUSTICE STOUDER, dissenting:

I disagree with almost every aspect of the majority opinion. I disagree with the manner in which the facts are presented; I have many concerns about the procedural posture of this case; and I disagree with the majority's analysis.

My factual disagreement with the majority opinion is the omission of certain testimony that undermines the majority's later attempt to classify the decedent's fall as employment related. I believe the following testimony of Virginia Griffith, the woman who found decedent at the bottom of the stairs, is very relevant and needs to be included in the opinion for a full understanding of this case:

"Q. After you observed her, what did you do?

A. I went over to her and asked her if I could help her, and was kneeling down. And she said, 'Yes, I need some help.'

And then she started explaining to me she had to get out of there, she had to get to the Federal Express box to deliver a package, she had to get home, it was either a meeting or an appointment or she had to give the car to somebody, but she was in a great hurry, she was very nervous, and at this point she was still lying down and said she just needed to rest for a minute.

\* \* \*

Q. Now, after she pulled herself up, what happened?

A. Well, Karl at this point was probably doing most of the talking, but he was, you know, very kindly saying, 'We need to have someone look you over before you can leave.'

And she kept saying, 'Absolutely not,' and somehow she was able to get herself up without the aid of Karl and myself and absolutely ran out the door, took a right to get to the Federal Express box, got in her car and took off.

\* \* \*

Q. How is it that you drew the impression that she was in a hurry?

A. Oh, she kept saying it, she kept saying, 'I've got to get out of here.' It was either to meet somebody or go to an appointment or something, but she was in a rush.

\* \* \*

Q. Do you recall anything about the manner in which she was driving at that time?

A. Well, she took off very quickly.

Q. Took off quickly in her car?

A. Yes. I mean, again, I got the impression she was racing to get somewhere."

The above testimony clearly shows that the decedent was still in a hurry *after* posting the Federal Express packages. The majority opinion does not explain why, if the decedent's haste was employment related, the decedent was still in a hurry after all job tasks had been completed.

My next disagreement with the majority opinion concerns the majority's explanation of the procedural posture of this case. The majority correctly states that on March 19, 1993, an opinion was filed by this court reversing the decision of the circuit court, that a petition for rehearing was granted, that the opinion was withdrawn, and that a majority of the court has now concluded that the Commission was correct. That, however, only begins to tell the story. On March 19, 1993, a unanimous opinion of this court was issued, agreeing with the Commission on the *factual* issues (that the decedent suffered an unexplained fall on the employer's premises), but finding that as *a matter of law* unexplained falls are not compensable injuries in a State that rejects the positional risk doctrine. The appellees then filed a petition for rehearing. The court granted the petition, withdrew the opinion, and asked the parties to submit additional briefs discussing out-of-State authority on the issues of unexplained falls, positional risk, and the relationship between the two subjects. Then a majority of this court, for whatever reason, concluded that the decedent had suffered a compensable injury because she was in a hurry at the end of the day and affirmed the Commission and circuit court on an issue entirely unrelated to the one the parties were directed to address.

After requiring the attorneys to go to the considerable time and expense of researching the law of 49 jurisdictions on a complex issue of law, it is interesting to note the amount of space the majority has given to that issue in its opinion. One paragraph? One sentence? No, not even one word. An outside reader of the majority's opinion would

have no idea that the issue on which the original unanimous opinion was decided had even been raised.

Under Supreme Court Rule 367(d) (134 Ill. 2d R. 367(d)), when a petition for rehearing is granted the nonmoving party is entitled to file a response to the petition. In this case, when the petition was granted this court entered an order directing the parties to file additional briefs solely on the issue of out-of-State authority on the subjects of positional risk and unexplained falls. This sent a message to the attorneys that the scope of our review on rehearing was limited to the correctness of our decision in light of the law of other jurisdictions. Granting the rehearing petition in this manner indicated to the appellants that it was not necessary to respond to the other issues raised in the petition. For this court to subsequently blindside the appellants with an opinion decided on a basis on which the case could have been disposed of originally is clearly unfair. Only one petition for rehearing is allowed, and the appellants should have been entitled to address the other issues.

Without stating so, the majority has apparently concluded that the issue of the relationship between unexplained falls and positional risk is irrelevant to its decision. The question the attorneys must now be asking themselves is, "If those issues are irrelevant, then why did the court order us to research the law in forty-nine jurisdictions on those issues?" Because I do believe those issues are relevant, and because I did not think that out-of-State authority was necessary to the decision, I leave that question for the majority to answer.

Finally, I disagree entirely with the analysis in the majority opinion. The majority initially concludes that the Commission was correct in determining that decedent suffered an unexplained fall. Sometime during the course of the next six paragraphs the fall undergoes a metamorphosis and emerges as an *explained* fall. By creatively selecting certain portions of the record, the majority has put together what it believes to be an employment-related reason for the decedent's fall. The employer apparently gave the employee too many tasks to complete near the end of the day and that somehow caused her to be in a hurry on her way home from work. This is not what the Commission found. The Commission found this fall to be unexplained. That was a factual finding to be reviewed under the manifest weight of the evidence standard and there is no basis for this court to disagree with that finding as it was not against the manifest weight of the evidence. Rather than deal with the difficult question of whether an unexplained fall is compensable in Illinois, given our supreme court's rejection of the positional risk doctrine, the majority decides to have its cake and eat it too by finding that the fall was both explained and unexplained.

Further, even if it was permissible for this court to disagree with the Commission and find this to be an explained fall, the majority's "explanation" makes no sense. There was no testimony that indicated that the employer asked the decedent to stay after work or gave her any tasks outside of regular business hours. Also, to the extent the majority is claiming that the employee's haste was to get to the Federal Express box, the testimony of Virginia Griffith clearly indicated that the decedent was in a hurry even after posting the Federal Express envelopes. The employee was still in a rush after completing all job tasks and told witnesses that she was in a hurry to either go to an appointment or to give someone else the car. The majority's conclusion, in light of these facts, that the decedent's haste was employment related is nothing short of incredible.

Perhaps the most curious assertion in the majority opinion is the statement, "the record does not indicate that decedent was going anywhere but home, after dropping off the envelopes." (261 Ill. App. 3d at 637.) Even if this statement were true, it begs the question of whether an employee who falls because she is rushing to get home suffers an injury arising out of her employment. If the decedent was rushing home to watch a television program, would that be a compensable injury? Apparently so, if the employer dared to give her any job tasks too close to quitting time. The message the majority opinion sends to employers is that they now have to always be aware of which employees will be in a hurry to leave work on certain days. On those days they should be cautious not to give those employees any assignments too close to quitting time, even if it is still during regular business hours and even if the employee is being paid for that time. After all, requiring an employee who is in a hurry to attend to personal business to put together envelopes for mailing during business hours could place "resulting stress" on the employee causing a fall. I strongly disagree with the majority's conclusion that this employee's haste was employment related.

I believe that the Commission's decision that the decedent suffered an unexplained fall on the employer's premises was not against the manifest weight of the evidence, but as a matter of law I do not believe such falls arise out of the employment. For an employee's injuries to be compensable, those injuries must arise out of and in the course of his or her employment, and both elements must be present at the time of the accident to justify compensation. (*Hatfill v. Industrial Comm'n* (1990), 202 Ill. App. 3d 547, 560 N.E.2d 369.) "Arising out of" refers to the origin or cause of the accident and presupposes a causal connection between employment and the accidental injury; "in the course of" refers to the time, place, and circumstances

under which the accident occurred. *Illinois Bell Telephone Co. v. Industrial Comm'n* (1989), 131 Ill. 2d 478, 546 N.E.2d 603.

This case can be distinguished from others in which compensation was awarded for unexplained falls. My review of other unexplained-fall cases indicates that in those cases, the Commission was able to infer that the fall was caused by some condition of the employer's premises. For instance, in *Chicago Tribune Co. v. Industrial Comm'n* (1985), 136 Ill. App. 3d 260, 483 N.E.2d 327, the claimant slipped and fell in the lobby of the employer's building. There was no idiopathic explanation for the claimant's fall, and the Commission was able to infer that the floor of the lobby was slippery from ice and water being tracked in by other employees. In *Rysdon Products Co. v. Industrial Comm'n* (1966), 34 Ill. 2d 326, 215 N.E.2d 261, the claimant, a spot welder, fell while working at a table. There was a gallon container of glue open on the table, the floor was uneven, and it was a hot, humid day. The Commission was able to infer that those factors caused the claimant's fall. In the instant case, there were no employment-related inferences for the Commission to draw from the decedent's fall; the fall was entirely unexplained. And, as already demonstrated above, the majority's eleventh-hour attempt to attribute the fall to the decedent's haste is not helpful because both the record and common sense indicate that her haste was not employment related.

Professor Arthur Larson has explained that recovery in a pure unexplained fall case can only be justified by an acceptance of the positional risk doctrine. (1 A. Larson, Workmen's Compensation § 10.31(a), at 3—94 (1990).) Our supreme court has explained:

"Under the positional risk doctrine, an injury may be said to arise out of the employment if the injury 'would not have occurred but for the fact that the conditions or obligations of the employment placed claimant in the position where he was injured by a neutral force, meaning by "neutral" neither personal to the claimant nor distinctly associated with the employment.' " (*Brady v. Louis Ruffolo & Sons Construction Co.* (1991), 143 Ill. 2d 542, 552, 578 N.E.2d 921, 925, quoting Larson, *The Positional-Risk Doctrine in Workmen's Compensation*, 1973 Duke L.J. 761, 761.)

Professor Larson has explained that risks causing injury can be separated into three categories: risks personal to the claimant, risks distinctly associated with employment, and neutral risks. Personal risks are not compensable, while risks associated with the employment are compensable. The confusion is over what should be done when an injury is caused by a "neutral" risk. (1 A. Larson, Workmen's Compensation §§ 7.00 through 7.30, at 3—12 through 3—14

(1990).) Professor Larson considers unexplained falls during the course of employment to be an example of a neutral risk. With regard to such falls, Larson states:

"If an employee falls while walking down the sidewalk or across a level factory floor for no discoverable reason, the injury resembles that from stray bullets and other positional risks in this respect: The particular injury would not have happened if the employee had not been engaged upon an employment errand at the time. In a pure unexplained-fall case, there is no way in which an award can by [sic] justified as a matter of causation theory except by a recognition that this but—for reasoning satisfies the 'arising' requirement." 1 A. Larson, Workmen's Compensation § 10.31(a), at 3—94 (1990).

Illinois has never accepted the "but-for" reasoning of the positional-risk doctrine (see *Brady*, 143 Ill. 2d 542, 578 N.E.2d 921; *Campbell "66" Express, Inc. v. Industrial Comm'n* (1980), 83 Ill. 2d 353, 415 N.E.2d 1043; *Decatur-Macon County Fair Association v. Industrial Comm'n* (1977), 69 Ill. 2d 262, 371 N.E.2d 597), and therefore compensation would not be warranted in a pure unexplained-fall case. By rejecting the positional-risk doctrine and allowing recovery for unexplained falls, Illinois has adopted positions that are inherently inconsistent. In this case, it was generally agreed that there was nothing wrong with the condition of the stairs on which the decedent fell. Because the Commission could draw no inference that a defect in the stairs existed, this was a pure unexplained fall. As such, compensation was improper. Cases such as *Chicago Tribune* and *Rysdon* were not necessarily wrongly decided, because the inferences the Commission drew in those cases placed them in the category of risks associated with the employment. Those cases were only erroneous to the extent they suggested that compensation would be proper in a pure unexplained-fall case. I would also note here that the appellant's supplemental brief on rehearing demonstrated a strong correlation in other jurisdictions between the concepts of positional risk and unexplained falls. Among jurisdictions that have addressed both issues, those that recognize positional risk as a theory of compensation generally compensate for unexplained falls and vice versa.

To recover in this case, the claimant must have shown that there was an increased risk of harm. The mere fact that an injured party was present at the place of injury because of employment duties will not by itself suffice to establish that the injury arose out of the employment. (*Brady*, 143 Ill. 2d 542, 578 N.E.2d 921.) A claimant must demonstrate that the risk of injury sustained is peculiar to his

employment, or that it is increased as a consequence of the work. (*Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38, 509 N.E.2d 1005.) If an industrial accident is caused by a risk unrelated to the nature of the employment, or is not fairly traceable to the workplace environment, but results instead from a hazard to which the claimant would have been equally exposed apart from his or her work, the injury cannot be said to arise out of the employment. *Material Service Corp., Division of General Dynamics v. Industrial Comm'n* (1973), 53 Ill. 2d 429, 292 N.E.2d 367.

The injury in this case occurred while the decedent was descending a flight of stairs. Descending stairs is not a hazard uniquely related to the decedent's employment, but rather is an ordinary activity engaged in by the general public. As we noted in *Elliot v. Industrial Comm'n* (1987), 153 Ill. App. 3d 238, 505 N.E.2d 1062, an idiopathic fall case, the act of descending stairs does not establish a risk greater than those faced outside of work. Absent a showing of an increased risk, the Commission erred in finding that the accident arose out of the decedent's employment.

Accordingly, I would reverse the judgment of the circuit court of Cook County. The majority has issued an opinion finding the decedent's fall to be both explained and unexplained and has based its "explanation" on an inference not reached by the Commission and one that is thoroughly contradicted by the record.

I dissent.

McCULLOUGH, P.J., joins in this dissent.